KRISTEN CLARKE
Assistant Attorney General for Civil Rights
REBECCA B. BOND (Cal. Bar No. 202220)
Chief, Disability Rights Section
KEVIN KIJEWSKI
Deputy Chief, Disability Rights Section
ELIZABETH JOHNSON
ALICE W. YAO
KATHERINE DUTCHER (Cal. Bar No. 313010)
Trial Attorneys, Disability Rights Section
U.S. Department of Justice
950 Pennsylvania Ave. NW — 4CON
Washington, D.C. 20530

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Chief, Civil Division
RICHARD M. PARK
Chief, Civil Rights Section
KATHERINE M. HIKIDA (Cal. Bar No. 153268)
MATTHEW J. BARRAGAN (Cal. Bar No. 283883)
MARGARET M. CHEN (Cal. Bar No. 288294)
ALEXANDRA YOUNG (Cal. Bar No. 336004)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LOS ANGELES COUNTY, CALIFORNIA,<br><br>Defendant. | No. 2:23-cv-05165-FLA(MRWx)<br><br>**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] JUDGMENT**<br><br>[Evidentiary Appendix and Request for Judicial Notice concurrently filed herewith]<br><br>Hearing Date:    June 7, 2024<br>Hearing Time:   1:30 p.m.<br>Courtroom:       First Street Courthouse<br>                          Courtroom 6B<br><br>Honorable Fernando L. Aenlle-Rocha<br>United States District Judge |

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on June 7, 2024 at 1:30 p.m., or as soon thereafter as it may be heard, Plaintiff United States will, and hereby does, move this Court for entry of partial summary judgment pursuant to Federal Rule of Civil Procedure 56. This motion is made before the Honorable Fernando L. Aenlle-Rocha, United States District Judge, Courtroom 6B, First Street Federal Courthouse, 350 West 1st Street, Los Angeles, California 90012.

Plaintiff brings the motion because there are no genuine triable issues of material fact as to Defendant's liability under the Americans with Disabilities Act for its failure to: (i) provide an in-person voting program accessible to persons with mobility and vision disabilities; and (ii) select vote centers that comply with ADA Standards and provide voters with disabilities an equal opportunity to vote in person and in the most integrated setting. Nearly all vote centers Defendant selects and operates have physical barriers for voters who use wheelchairs, canes, or walkers, or have vision disabilities. Therefore, Plaintiff is entitled to partial summary judgment as a matter of law.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, [Proposed] Partial Judgment, Evidentiary Appendix, Request for Judicial Notice, and all pleadings, records, and other documents filed in this action, and upon such oral argument as may be presented at the hearing of this motion.

This motion is made following the April 2, 2024, conference of counsel pursuant to Local Rule 7-3. In addition, on April 9, 2024, counsel for the parties conferred and agreed that the United States will move for summary judgment and that the County will oppose the motion as to the issue in accordance with the Court's requirement's regarding motions under Rule 56.

Dated: April 17, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Chief, Civil Division
RICHARD M. PARK
Chief, Civil Rights Section

KRISTEN CLARKE
Assistant Attorney General for Civil Rights
REBECCA B. BOND
Chief, Disability Rights Section
KEVIN KIJEWSKI
Deputy Chief, Disability Rights Section

*/s/ Katherine M. Hikida*
KATHERINE M. HIKIDA
MATTHEW J. BARRAGAN
MARGARET M. CHEN
ALEXANDRA YOUNG
Assistant United States Attorneys

*/s/ Alice W. Yao*
ELIZABETH JOHNSON
ALICE W. YAO
KATHERINE DUTCHER
Trial Attorneys
Disability Rights Section

Attorneys for Plaintiff
United States of America

# **TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                                <u>PAGE</u>

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF UNCONTROVERTED FACTS...........................................3

    A.    The County Has Sole Control Over Selecting Vote Centers, Including Those That Can Accommodate Voters with Disabilities.............................3

    B.    The Pervasiveness of Vote Center Accessibility Barriers is Undisputed.........................................................................................4

    C.    Vote Center Accessibility Barriers Deny Voters with Disabilities an Equal Opportunity to Vote. ...............................................................6

III.  ARGUMENT ......................................................................................8

    A.    The ADA Applies to the County's In-Person Voting Program. ..................8

    B.    The County Violates the ADA by Failing to Provide an Accessible Program for Voting In Person. .................................................11

        1.    The County's site selection process violates the ADA.....................11

        2.    The County violates the ADA by failing to provide voters with disabilities access to its in-person voting program. .........................14

IV.   CONCLUSION..................................................................................18

i

# TABLE OF AUTHORITIES

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

## <u>FEDERAL CASES</u>

*Am. Ass'n of People with Disabilities v. Shelley,*
   324 F. Supp. 2d 1120 (C.D. Cal. 2004) ...................................................9, 10

*Anderson v. Pa. Dep't of Pub. Welfare,*
   1 F. Supp. 2d 456 (E.D. Pa. 1998) ..................................................................14

*California ex rel. Lockyer v. County of Santa Cruz,*
   2006 WL 3086706 (N.D. Cal. Oct. 30, 2006) ..............................................14

*Cal. Council of the Blind v. Cnty. of Alameda,*
   985 F. Supp. 2d 1229 (N.D. Cal. 2013) .........................................................11

*Disabled in Action v. Bd. of Elections in City of New York,*
   752 F.3d 189 (2d Cir. 2014) ............................................................................10

*Kirola v. City & Cnty. of San Francisco,*
   860 F.3d 1164 (9th Cir. 2017) ........................................................................16

*Kerrigan v. Philadelphia Bd. of Election,*
   2008 WL 3562521 (E.D. Penn. Aug. 14, 2008) ...........................................18

*Meadows v. Hudson Cnty. Bd. of Elections,*
   2006 WL 2482956 (D.N.J. Aug. 24, 2006) ...............................................9, 10

*National Federation of the Blind v. Lamone,*
   752 F.3d 494 (4th Cir. 2016) ..........................................................................10

*Nat'l Org. on Disability v. Tartaglione,*
   2001 WL 1231717 (E.D. Pa. Oct. 11, 2001) ................................................12

*People of New York ex rel. Spitzer v. Cnty. of Delaware,*
   82 F. Supp. 2d 12 (N.D.N.Y. 2000)..................................................................9

*People of New York ex rel. Spitzer v. Cnty. of Schoharie,*
   82 F. Supp. 2d 19 (N.D.N.Y. 2000).................................................10, 14, 16

*Tennessee v. Lane,*
   541 U.S. 509 (2004)...........................................................................................9

*United Spinal Ass'n v. Bd. of Elections in the City of New York,*

882 F. Supp. 2d 615 (S.D.N.Y. 2012) .................................................................passim

*United States v. Florida,*
938 F.3d 1221 (11th Cir. 2019) .................................................................. 10

*Weinreich v. L.A. Cnty. Metro. Transp. Auth.,*
114 F.3d 976 (9th Cir. 1997) ...................................................................... 9

## FEDERAL STATUTES

42 U.S.C. § 12131 ...........................................................................................8, 9

42 U.S.C. § 12132 ..............................................................................................8

42 U.S.C. § 12134 ..............................................................................................9

52 U.S.C. § 20901 ..............................................................................................4

## FEDERAL REGULATIONS

28 C.F.R. Part 35 ...........................................................................................9, 15

28 C.F.R. § 35.104 .................................................................................1, 13, 15

28 C.F.R. § 35.130 ...................................................................................*passim*

28 C.F.R. § 35.149 ......................................................................................15, 17

28 C.F.R. § 35.151 .................................................................................3, 15, 17

28 C.F.R. § 36.102(e) .......................................................................................12

28 C.F.R. § 35.150 .................................................................................1, 15, 17

## STATE REGULATIONS

CAL. CODE REGS. tit. 24 (2024) ......................................................................5

CAL. CODE REGS. tit. 21 (2024) ......................................................................5

1

## <u>OTHER AUTHORITIES</u>

56 Fed. Reg. 35,694 (July 26, 1991) ...................................................................15

California Secretary of State, Polling Place Accessibility Guidelines ..............................5

U.S. Dep't of Justice, 1991 ADA Standards (1991) ...........................................1

U.S. Dep't of Justice, 2010 ADA Standards (Sept. 15, 2010) ...........................1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The right to vote is the cornerstone of our democracy. Generations of Americans have fought and struggled to protect and expand this sacred right. This is for good reason: The ability to vote is essential to allow citizens to exercise freedom of choice, signal policy preferences, and participate in civic life. As such, access to the ballot box is a necessary element, the *sine qua non*, of our democratic system of government.

Voters with disabilities are entitled to an equal opportunity to vote in person, privately and independently, alongside their neighbors and friends. Yet, in Los Angeles County, voters with disabilities are routinely obstructed from voting in person due to physical barriers at County vote centers. These barriers can make it difficult, if not impossible, for voters with mobility or vision disabilities to navigate to vote center entrances and into voting areas.

Plaintiff United States seeks to stop Los Angeles County from violating Title II of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. §§ 12131-12134, by selecting and operating vote centers that are inaccessible to voters with disabilities. The stakes are significant—Los Angeles County is the nation's largest local election jurisdiction and more than one million of the County's eligible voters have a mobility or vision disability. The County has conceded, however, that probably close to 98 percent of the March 2024 Election vote centers had elements that fail to meet the 1991 or 2010 ADA Standards for Accessible Design (ADA Standards) and have barriers to access.[1] *See* 28 C.F.R. §§ 35.150(b)(1), 35.151. The County's own surveys of fifty

---

[1] The ADA Standards "set minimum requirements—both scoping and technical—for newly designed and constructed or altered State and local government facilities, public accommodations, and commercial facilities to be readily accessible to and usable by individuals with disabilities." 2010 ADA Standards, Introduction (U.S. Dep't of Justice, Sept. 15, 2010), https://www.ada.gov/law-and-regs/design-standards/2010-stds/. *See also* 1991 ADA Standards, Purpose (U.S. Dep't of Justice, 1991), https://www.ada.gov/law-and-regs/design-standards/1991-design-standards/. The ADA Standards are part of Title II's implementing regulation and relevant for determining whether a public entity is meeting Title II obligations in selecting sites for and providing access to its programs. *See* 28 C.F.R. §§ 35.104, 35,130(b)(4), 35.149-35.151.

March 2024 Election vote centers show that *almost all these vote centers* (forty-eight of fifty) did not comply with ADA Standards. These barriers make it more difficult for a voter with a disability to exit their vehicle and safely transfer to their wheelchair upon arriving at a vote center, and more likely to trip, fall, or otherwise injure themselves when walking to the vote center once inside.[2] Indeed, the County conceded that even if a vote center has no accessible parking, no accessible route to the entrance, no accessible entrance, and no accessible route to the voting area, it refuses to reject it as a potential vote center during its site selection process. Additionally, the County conceded that it fails to use many temporary remedial measures that could make vote centers accessible during voting.

Because the facts related to vote center inaccessibility are undisputed, Plaintiff United States now moves for partial summary judgment on liability. As in a similar case involving accessibility of New York City's polling places, *United Spinal Ass'n v. Bd. of Elections in the City of New York*, 882 F. Supp. 2d 615 (S.D.N.Y. 2012), *aff'd sub nom. Disabled in Action v. Bd. of Elections in City of New York,* 752 F.3d 189 (2d Cir. 2014), a liability ruling will allow the parties, and the Court, to shift focus to developing an effective remedy. In *United Spinal*, following a liability ruling for plaintiffs, the judge required the parties to propose a remedy for polling place inaccessibility for an upcoming Presidential Election and future elections. *Id.* at 627-28. Similarly here, a ruling on liability would be based on undisputed facts and expedite development and implementation of a remedy for the 2024 Presidential Election and future elections. To be clear, the United States does not expect the County will be able to eliminate all

---

[2] The barriers at these inaccessible vote centers include lack of van accessible parking with enough space to allow voters who use a wheelchair to safely exit their vehicle using a lift; lack of a level surface that may prevent voters with disabilities from safely transferring from their vehicles to their wheelchairs; wide gaps on walkways to entrances that make it more likely voters with disabilities will fall or trip; abrupt level changes on walkways or at entrance doors that can impede wheelchair access or cause injury; excessive running and cross slopes that make it more likely voters with disabilities will fall; and hallways with protruding objects that a voter who is blind could hit with their head or body.

2

barriers at its vote centers by this fall, but it must start reforming its site selection process to address accessibility concerns.

For these reasons, Plaintiff United States requests a liability ruling declaring Los Angeles County's program for selecting and operating vote centers renders its in-person voting program inaccessible to voters with disabilities and violates the ADA.

## II.    STATEMENT OF UNCONTROVERTED FACTS

### A.    The County Has Sole Control Over Selecting Vote Centers, Including Those That Can Accommodate Voters with Disabilities.

The County is the "largest local voting jurisdiction in the nation with more than 5.7 million registered voters." Statement of Uncontroverted Fact (SUF) No. 1. "The Registrar-Recorder/County Clerk is responsible for administering local, state, and federal elections in the County's jurisdiction and ensuring all voters have the knowledge, access, and opportunity to participate in [the] democratic process." SUF No. 2.

The County designates facilities as vote centers for in-person voting. SUF No. 3. The County explained its obligation to ensure facilities are accessible to voters is the same regardless of whether it owns the facility.[3] SUF No. 4. "[T]he ADA Standards provide the minimum requirements that are necessary for a site to be deemed accessible and useable as a vote center." SUF No. 5.

Voters may cast their ballot at any vote center on Election Day. SUF No. 6. At least 90% of vote centers must be open for three days before Election Day, and others for ten days before Election Day. SUF No. 7. In the 2020 Presidential Election, more than 913,000 people voted at the County's vote centers. SUF No. 8. In the 2022 General Election, more than 487,000 people voted at the County's vote centers. SUF No. 9. The County does not publish which vote centers are accessible to voters with disabilities. SUF No. 10.

---

[3] The County has an obligation under Title II to ensure facilities constructed by, on behalf of, or for the use of a public entity after January 26, 1992, are "designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151.

3

The County offers voting in person and curbside voting at vote centers. SUF No. 11. It also offers Vote by Mail, including ballot drop boxes, and Mobile and Flex Vote Centers for voters unable to travel or use mail. SUF No. 12.

Under the Help America Vote Act, the County received millions in federal funds, including approximately $1.8 million recently for equipment, training, and improvements for vote center accessibility. *See* 52 U.S.C. § 20901(b)(1); SUF No. 13. The County sometimes employs temporary remedial measures, such as doorstops, signage, and cones to improve vote center accessibility. SUF No. 14. The County does not employ other temporary remedial measures, such as portable doorbells to improve access to entrance doors or curbside voting; portable ramps to address steps, level changes, curbs without curb cuts, gaps, or steep slopes; metal plates to cover gaps, or cracks; wedge ramps to address level changes or high door thresholds; or temporary gap filler for gaps, including between sidewalk slabs. SUF No. 15.

**B.     The Pervasiveness of Vote Center Accessibility Barriers is Undisputed.**

It is undisputed that the County selects and operates vote centers that violate the ADA Standards. The County is solely responsible for selecting and operating vote centers. SUF No. 16. The County admitted that probably close to 98 percent of the March 2024 Election vote centers had elements that violate the ADA Standards and unmitigated accessibility barriers. SUF No. 17. Physical accessibility for voters with disabilities is one of fourteen factors[4] considered when choosing a vote center, SUF No. 18, and the County still considers facilities with known, unmitigated accessibility

---

[4] The fourteen factors are: (1) proximity to public transportation; (2) proximity to communities with historically low vote by mail usage; (3) proximity to population centers; (4) proximity to language minority communities; (5) proximity to voters with disabilities; (6) proximity to communities with low rates of household vehicle ownership; (7) proximity to low-income communities; (8) proximity to communities of eligible voters who are not registered to vote and may need access to same day voter registration; (9) proximity to geographically isolated populations; (10) accessibility to accessible and free parking; (11) distance and time needed to travel by car or public transportation to a location; (12) alternate methods of voting for voters with disabilities for whom vote by mail ballots are not accessible; (13) traffic patterns; and (14) need for mobile vote centers to supplement vote centers. County's Interrog. Resp. 7:9-21.

barriers. SUF No. 19.

According to the County, under its site selection process it surveys available facilities that may be designated as a vote center every five years. SUF No. 20. Of the 644 County vote centers used in the March 2024 Election, the County's accessibility surveys for fifty vote centers show forty-eight violated the ADA Standards. SUF No. 21. These surveys are based on state accessibility standards and the ADA Standards,[5] and were performed by County employees before the election. SUF No. 22. The declaration of Glenn Dea, a licensed architect and Certified Accessibility Specialist,[6] states the surveys identified many physical barriers that rendered the vote centers inaccessible and potentially unsafe to voters with mobility or vision disabilities. SUF No. 23.

The County's surveys show many problems, including:

- 20 vote centers had inaccessible parking. SUF No. 24.

- 45 vote centers had inaccessible exterior routes. SUF No. 25.

- 7 vote centers had inaccessible entrances. SUF No. 26.

- 20 vote centers had inaccessible interior routes. SUF No. 27.

- 23 vote centers had inaccessible voting areas. SUF No. 28.

One vote center, Ahmanson Senior Center had inaccessible parking, inaccessible exterior routes, inaccessible entrances, inaccessible exterior routes, and an inaccessible

---

[5] The County's surveys are based on California Code of Regulations and Secretary of State guidance. CAL. CODE REGS. tit. 24 (2024); California Secretary of State, *Polling Place Accessibility Guidelines*, https://www.sos.ca.gov/elections/publications-and-resources/polling-place-accessibility-guidelines (last visited April 4, 2024). The California Code of Regulations has more stringent requirements than the 2010 ADA Standards. Consequently, the County's survey questions vary slightly from the Department of Justice (DOJ) checklist questions. However, noncompliance with the ADA Standards as reflected in the DOJ checklist is also noncompliance with California requirements. Dea Decl. ¶ 14. For this motion, the United States did not assess elements for which noncompliance with the California requirements would not constitute a violation of the 2010 ADA Standards.

[6] The California State Architect certifies a Certified Access Specialist (CASp) as being "knowledgeable of state and federal accessibility laws and regulations and possess[ing] the expertise to promote access to facilities for persons with disabilities." CAL. CODE REGS. tit. 21, § 111 (2024). A CASp is qualified to review and investigate facilities "for compliance with state and federal accessibility laws, standards, codes, and regulations," and to conduct research, prepare reports, conduct inspections, and issue disability access inspection certificates. *Id.* § 113.

1    voting area. SUF No. 83.

2        County surveyors also identified 24 vote centers with a curb ramp running slope

3    that exceeded the ADA Standards' maximum slope of 1:12 or 8.33%, including a

4    38.65% slope on the curb ramp leading from parking to the entrance at Mid Valley

5    Senior Center. SUF No. 29. Slopes exceeding 8.33% increase the risk of falling,

6    tripping, and other injury. SUF No. 30. Despite this noncompliance, documented by

7    County surveys, these locations were used in the March 2024 Election. SUF No. 31.

8        **C.**    **Vote Center Accessibility Barriers Deny Voters with Disabilities an**

9               **Equal Opportunity to Vote.**

10        More than 7.6 million voting-age adults reside in Los Angeles County. SUF No.

11    32. Of these voting-age residents, 13.6%, or more than one million individuals, have a

12    disability. SUF No. 33. More than 560,000 voting-age adults in the County have

13    mobility disabilities, of which more than 60% are sixty-five or older. SUF No. 34.

14    Approximately 224,000 voting-age adults in the County have vision disabilities, of

15    which 40% are sixty-five or older. SUF No. 35.

16        Jaime Young, Assistant Division Manager of the Elections Operations and

17    Logistics Bureau of the Registrar-Recorder/County Clerk's Office, SUF No. 36, testified

18    to the dangers voters with disabilities face at facilities that violate the ADA Standards.

19    For example, Ms. Young testified that objects that protrude into the path of travel and do

20    not meet the ADA Standards may cause a person with a vision disability to hit their head

21    or body. SUF No. 37. In addition, she testified that the ADA Standards governing slopes

22    and cross slopes along accessible routes are important so people using mobility devices

23    can travel safely without falling, tipping backwards, or tripping. SUF No. 38. She

24    acknowledged a route that violates more than one of these requirements can compound

25    the risk of injury. SUF No. 39.

26        Ms. Young testified to the importance of ensuring ramps have handrails for people

27    using wheelchairs to safely use the ramp. SUF No. 40. The ADA Standards'

28    requirements for edge protection on ramps prevent people using wheelchairs from falling

or tipping over the ramp edge. SUF No. 41. Similarly, door threshold requirements help people with mobility disabilities safely cross thresholds without tripping or falling. SUF No. 42.

Dina Garcia, a registered voter since 1992 who has a physical disability and uses a wheelchair, explained how such obstacles impacted her during a recent election. SUF Nos. 43-44. In August 2019, Ms. Garcia visited a polling place in Chatsworth with her father. SUF No. 45. Ms. Garcia wanted to vote curbside, but the County did not provide a method for her to tell staff inside the facility that she wanted to vote outside, so she could not vote independently. SUF Nos. 46-47. Instead, her father took her identification inside to check in and retrieve a ballot. He returned with a ballot and completed it for her because she was not provided a clipboard or hard writing surface to complete it independently. He returned her ballot inside. SUF Nos. 48-49. At no time did election staff assist Ms. Garcia with voting. SUF No. 50. Ms. Garcia stated:

> I was very frustrated and disappointed about the voting process during that election because I felt the poll workers treated me differently and disrespectfully like a second-class citizen due to my disability. I felt that my freedom to vote privately and independently had been taken away from me in that election. I simply wanted to vote like everyone else.

SUF Nos. 51-52.

Carrie Madden has muscular dystrophy, uses a motorized wheelchair, and requires assistance from a personal care attendant (PCA). SUF Nos. 53-54. During the March 2024 Election, Ms. Madden went with her PCA to vote at Elk's Lodge #2190 in Canoga Park. SUF No. 55. Once there, she and her PCA followed signage to the designated accessible entrance at the back of the building. SUF No. 56. Ms. Madden asked her PCA to open the closed door. He tried but it appeared to be locked. They knocked and rang the doorbell several times, but no one came. SUF No. 57-58. Ms. Madden thought they were at the wrong door and went further along the back of the building. When she saw there was no other entrance, they went back and rang the doorbell again with no answer. SUF No. 59. Ms. Madden asked her PCA to return to the main entrance to find an

election worker to help. When he came back, he reported not seeing anyone to help. Ms. Madden asked him to go back to the main entrance and inside the building. SUF No. 60-61. He returned with someone who tried to open the door, failed, and left. When the election worker came back, he tried again. SUF No. 62-63. A woman pushed the door from inside. SUF No. 63. After it opened, she suggested leaving it open. SUF No. 64. Ms. Madden and her PCA followed her inside through some dark rooms and into the voting area, where Ms. Madden voted. SUF No. 65. Ms. Madden and her PCA left the voting area and with no signage, had to guess how to exit the building. They went through dark rooms with no signage and had to guess which way to go. At one point, they went the wrong way. SUF No. 66. When they left, the door was closed again and no election workers were in sight. SUF No. 67.

Ms. Madden "felt saddened by the experience because the County could have done a better job." SUF No. 68. She did "not understand why no one checked the door by the accessibility entrance" because "[w]heelchair users would have to use that door and would not be able to go up the steps to the main entrance to find help." SUF No. 69. If Ms. Madden had not been accompanied by her PCA, she would not have been able to vote. SUF No. 70.

## III.  ARGUMENT

### A.  The ADA Applies to the County's In-Person Voting Program.

Title II of the ADA prohibits discrimination by public entities, including the County. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[7] 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a); *see also id.* § 35.130(b)(1). The

---

[7] A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). A "public entity" is defined as "any State or local government" or

*(footnote cont'd on next page)*

ADA regulation, 28 C.F.R. Part 35, implements this nondiscrimination mandate. *See* 42 U.S.C. § 12134.

Voting, like all programs, services, or activities of state and local governments, is covered by the ADA, *id.* §§ 12131-12134. *See id*. § 12101(a)(3) ("The Congress finds that . . . discrimination against individuals with disabilities persists in such critical areas as . . . voting[.]"); *see also Tennessee v. Lane*, 541 U.S. 509, 525 (2004) (finding "a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including . . . voting"); *Am. Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1125 (C.D. Cal. 2004) ("The ADA applies to all programs, services, and activities of state and local governments, including elections."). Other courts have held a public entity's failure to make polling places accessible to people with disabilities violates the ADA. *See United Spinal*, 882 F. Supp. 2d at 624, 627-28 (granting summary judgment on plaintiffs' claim of "pervasive and recurring barriers to accessibility on election dates at poll sites designated by [defendant]" and failure to provide accommodations); *People of New York ex rel. Spitzer v. Cnty. of Delaware*, 82 F. Supp. 2d 12, 17-18 (N.D.N.Y. 2000) (stating access to polling places qualifies as a program under the ADA and "[f]ailure to make polling places accessible violates these provisions" (citation omitted)); *Meadows v. Hudson Cnty. Bd. of Elections*, Civ. No. 04-3979 (WHW), 2006 WL 2482956, at *5 (D.N.J. Aug. 24, 2006) ("Nor is there any dispute . . . access to polling places constitutes a service, program, or activity.").

Under the ADA, the United States must show that the County's services, programs, or activities exclude, deny benefits to, or otherwise discriminate against qualified individuals with disabilities, because of disability. *See Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (stating the *prima facie*

---

"department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1)(A)-(B).

elements of ADA claims).[8] In the voting context, a "qualified individual with a disability" is a registered voter with a disability. *See, e.g.*, *Meadows*, 2006 WL 2482956, at *5. The responsible public entity is the unit of local government in charge of supervising the election, including designation and maintenance of polling sites. *See, e.g.*, *People of New York ex rel. Spitzer v. Cnty. of Schoharie*, 82 F. Supp. 2d 19, 22 (N.D.N.Y. 2000).

The County's registered voters with disabilities are qualified persons with disabilities. *See Am. Ass'n of People with Disabilities*, 324 F. Supp. 2d at 1124 (holding "registered voters in the State of California who have either visual or manual impairments which substantially limit one or more major life activities" are "'qualified individuals with disabilities' within the meaning of the [ADA]"); *Meadows*, 2006 WL 2482956, at *5. The County admits it is the responsible unit of local government in charge of supervising elections, including the designation and maintenance of vote centers. SUF No. 71.

Appellate courts have made clear that opportunities given voters with disabilities to vote by a particular method—such as in-person voting—must be equal to those for voters without disabilities. For example, in *National Federation of the Blind v. Lamone*, plaintiffs challenged Maryland's use of paper ballots for absentee voting, arguing that voters with vision disabilities were denied equal opportunity when voting absentee. 752 F.3d 494, 504 (4th Cir. 2016). The Fourth Circuit rejected defendants' arguments that the court must consider Maryland's voting program as a whole, including other ways in which voters with disabilities could vote, and instead evaluated plaintiffs' claims in the context of the absentee voting program. *Id. Accord Disabled in Action*, 752 F.3d at 199 ("[T]o assume the benefit is . . . merely the opportunity to vote at some time and in some way [ ] would render meaningless the mandate that public entities may not afford

---

[8] The United States Attorney General is charged with enforcing Title II and has enforcement powers to do so. *United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019), *cert. denied,* 143 S. Ct. 89 (2022).

persons with disabilities services that are not equal to that afforded others.") (internal citations, alteration, and quotations omitted)).

## B. The County Violates the ADA by Failing to Provide an Accessible Program for Voting In Person.

The County's systemwide failure to prevent and remedy barriers to access vote centers harms and potentially disenfranchises more than one million voters with disabilities. Through the site-selection process and use of temporary remedial measures, the County can provide an equal opportunity for voters with disabilities to vote in person. *See* 28 C.F.R. §§ 35.130(b)(4), 35.150(b)(1); SUF No. 72.

The ADA applies to the County's voting programs and requires it to ensure that its voting program, specifically in-person voting, is accessible to persons with disabilities. *See supra* Part III.A. For the in-person voting program, the County must select vote centers where persons with disabilities can vote privately and independently, alongside fellow voters. 28 C.F.R. §§ 35.130(b)(4), 35.149-35.150. *See, e.g.*, *Cal. Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013) ("[U]nder the terms of the ADA . . . the covered entity must provide meaningful access to private and independent voting."). The County must also ensure that it chooses vote centers where voters with disabilities have access to in-person voting.  The County fails to live up to either standard.

### 1. The County's site selection process violates the ADA.

The ADA's implementing regulation prohibits a public entity from selecting sites and facilities in which to provide programs, services, or activities "[t]hat have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination," or "[t]hat have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(4). The County's vote centers are not facilities used only for elections; instead they are typically used for other activities and selected as vote centers by the

County before Election Day. The County must comply with the ADA when selecting vote centers. *See id.* pt. 35, app. B § 35.130 (explaining the prohibition applies to the "process of . . . selecting existing facilities to be used by the public entity").[9]

The County discriminates based on disability by selecting vote centers with accessibility barriers and failing to take steps to ensure it does not exclude or deny voters with disabilities from in-person voting at those facilities. *Nat'l Org. on Disability v. Tartaglione*, No. CIV. A. 01-1923, 2001 WL 1231717, at *7 (E.D. Pa. Oct. 11, 2001) (holding plaintiffs' allegation that defendants "regularly reassign polling places to new locations but do not require that those new sites be accessible to voters with mobility impairments . . . can have the effect of depriving mobility impaired voters of the benefit of voting in their neighborhood polling places in the same manner as non-disabled voters, in violation of 28 C.F.R. § 35.130(b)(4)").

Although the County selects vote centers based on multiple factors, including accessibility, its selection process does not meet ADA requirements. The County admitted its site selection process does not exclude facilities with accessibility barriers from consideration as vote centers, SUF No. 73, even if using the facilities would subject individuals with disabilities to discrimination. To determine the accessibility of potential vote centers, the County conducted surveys that rely on California regulations and guidance, which are more stringent than the ADA Standards. The ADA Standards "set minimum requirements . . . for newly designed and constructed or altered State and local government facilities, public accommodations, and commercial facilities to be readily accessible to and usable by individuals with disabilities." 2010 ADA Standards, Introduction; *see also* 1991 ADA Standards, Purpose.

The ADA Standards are part of the Title II regulation and relevant for determining whether a public entity selects sites and provides access to programs in compliance with

---

[9] The County designates private facilities as vote centers, including churches and businesses; some may be exempt from federal design and construction requirements under Title III of the ADA, *See* 28 C.F.R. § 36.102(e). This does not obviate the County's obligation to select sites consistent with its ADA obligations.

Title II and its implementing regulation. 28 C.F.R. §§ 35.104, 35.130(b)(4), 35.149-35.151. The ADA Standards are used as a guide for determining the existence of barriers. See ADA Americans with Disabilities Act Title III Regulations, § 36.308 Seating in assembly areas (U.S. Dep't of Justice, Mar. 8, 2012) https://www.ada.gov/law-and-regs/regulations/title-iii-regulations/. The 2010 ADA Standards provide detailed guidance for newly constructed and altered assembly areas. and these Standards also serve as a new guide for barrier removal. *Id.* Complying with the ADA Standards is not only key to ensuring vote centers are readily accessible to and usable by people with disabilities, but also, as the County acknowledged, failure to meet these requirements poses dangers for voters with disabilities. SUF No. 74.

The County admitted that "probably close" to 98 percent of March 2024 Election vote centers had unmitigated accessibility barriers. SUF No. 75. County surveys from fifty March 2024 Election vote centers show that forty-eight do not comply with the ADA Standards and obstruct entry, are dangerous to voters with disabilities, or impede their travel throughout the vote center. SUF No. 76. The County surveys showed that many vote centers had multiple accessibility issues, including a lack of van-accessible parking; sidewalks and walkways with abrupt level changes, gaps, or excessive cross slopes; ramps and curb ramps with excessive running slopes; ramps without handrails; and entrances without level landings, were too narrow, or had high thresholds. SUF No. 77.

Nor has the County successfully addressed the accessibility issues its surveyors identified. Although the County acknowledges that temporary remedies can remediate barriers, it does not use many of them. SUF No. 78. For example, temporary ramps can remediate abrupt level changes or steps, flat ramps or metal plates can cover wide gaps or grates, and temporary gap filler can fill large gaps between sidewalk pavers. But the County does not use these temporary measures, denying voters with disabilities the benefits of voting at accessible vote centers. SUF No. 15.

In *California ex rel. Lockyer v. County of Santa Cruz*, the district court disagreed

with the plaintiff's seeming contention that a "single violation of the [1991 ADA Standards] at a polling location constitutes a violation of the ADA." No. C-05-04708 RMW, 2006 WL 3086706, at *3 (N.D. Cal. Oct. 30, 2006). In contrast, the United States does not contend that the County violated the ADA solely because its vote centers do not comply with the ADA Standards. Instead, the United States contends that the inaccessibility of the County's vote centers, together with its policy of using vote centers with known accessibility violations and its failure to implement temporary remedial measures that could improve access or even make some vote centers accessible on Election Day, is more than sufficient to establish a violation of the ADA and its site selection regulation, 28 C.F.R. § 35.130(b)(4). *See also Cnty. of Schoharie,* 82 F.Supp.2d at 26 (granting preliminary injunction for plaintiffs and noting county was "empowered to select an alternate, suitable place" if a polling place was not in compliance with the 1991 ADA Standards and presumably "both unsuitable and unsafe").

Some courts have held that a public entity can select sites that are inaccessible "so long as the inclusion of the inaccessible sites did not have the purpose or effect of denying individuals an opportunity to benefit from the *program*." *Anderson v. Pa. Dep't of Pub. Welfare,* 1 F. Supp. 2d 456, 465 (E.D. Pa. 1998). The County cannot make that argument here—its policy is to consider using sites where it has identified accessibility barriers. This policy may not only deny voters with disabilities the opportunity to vote but also frustrates the purpose of the County's voting program to provide "election services in a fair, accessible and transparent manner." SUF No. 79.

      2.    <u>The County violates the ADA by failing to provide voters with disabilities access to its in-person voting program.</u>

Under Title II of the ADA, "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or

activities of a public entity." 28 C.F.R. § 35.149. For existing facilities,[10] a public entity must ensure that each "service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[11] *Id.* § 35.150(a).

As DOJ explained when promulgating the Title II regulation, "the program access requirement of [the ADA] should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases." *Nondiscrimination on the Basis of Disability in State and Local Government Services*, 56 Fed. Reg. 35,694, 35,708 (July 26, 1991) (to be codified at 28 C.F.R. pt. 35). A public entity may comply through "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, . . . alteration of existing facilities and construction of new facilities, . . . or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(b)(1). The public entity must prioritize a method of compliance with the program access requirements that offers programs to individuals with disabilities "in the most integrated setting appropriate." *Id.*

The district court in *United Spinal* explained that an ADA violation does not necessarily follow when a polling site is "less than ideally accessible." 882 F. Supp. 2d at 626. Rather, to demonstrate that individuals were deprived of an opportunity or benefit or discriminated against because of their disabilities, the relevant inquiry is whether defendants "failed to undertake some feasible measure to improve accessibility." *Id.* (citations and emphasis omitted). The court, finding "pervasive and recurring barriers to accessibility" at poll sites, granted summary judgment for plaintiffs because the

---

[10] An "existing facility" is "a facility in existence on any given date, without regard to whether the facility may also be considered newly constructed or altered under [28 C.F.R. Part 35]." 28 C.F.R. § 35.104.

[11] A public entity's obligation for facilities that are constructed or altered after January 26, 1992, is focused on the accessibility of each facility or part of the facility used, rather than the accessibility of each service, program, or activity. 28 C.F.R. § 35.151.

designated poll sites (i) included unsafe or missing ramps, missing signage, and improper placement of equipment and furniture in voting areas; (ii) defendant admitted more than two poll sites had not met accessibility standards; and (iii) defendant did not undertake feasible measures to improve accessibility. *Id.* at 624, 627. *See also Cnty. of Schoharie*, 82 F. Supp. 2d at 25-26 (noting feasible measures the county could undertake to improve accessibility of polling places and comply with preliminary injunction).

The Ninth Circuit has explained that more than anecdotal evidence and analysis of a small portion of the sites at issue are needed to establish a systematic failure to comply with the ADA. In *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164 (9th Cir. 2017), the Ninth Circuit affirmed the district court's finding that plaintiffs failed to establish San Francisco's park program and public right-of-way, when viewed in their entirety, were inaccessible to persons with disabilities. *See id.* at 1184. The court found plaintiffs' allegations were based on "anecdotal" evidence and expert analysis of only a "small fraction" of the city's total right-of-way and park offerings. *Id.* at 1183-84 (noting, for example, plaintiffs' experts inspected only 10 of roughly 7,200 intersections and only 13 parks, 7 mini parks, and 16 playgrounds of approximately 220 recreational parks and 400 structures within the park program). Unlike *Kirola*, the undisputed evidence here shows widespread violations of the ADA's program access requirements. As in *United Spinal*, where the court found that plaintiffs "provided copious documentation of barriers at poll sites" using third-party poll-site accessibility surveys, the accessibility barriers at the County's vote centers are not anecdotal, but rather are documented by its own surveys and are a result of its own policies. *See United Spinal*, 882 F. Supp. 2d at 624.

Here, the County's own evidence shows it did not employ sufficient methods to comply with the ADA. First, the Registrar-Recorder's policy is not to eliminate any site from consideration as a potential vote center, even if it has no accessible parking, no accessible route to the entrance, no accessible entrance, and no accessible route to the voting area. SUF No. 80. Second, the County does not direct voters with disabilities to

nearby accessible vote centers, nor could it. As the County admitted and as its surveys show, "probably 98 percent" of vote centers used in the March 2024 Election have accessibility barriers. SUF No. 75. Further, the County identified elements that violated the ADA Standards and failed to employ certain temporary remedial measures that may provide access to vote centers. SUF No. 81.

The County must ensure its vote centers are accessible regardless of whether it owns the facility. *See, e.g.*, *United Spinal*, 882 F. Supp. 2d at 624 ("It is no excuse that the [defendant] does not own the locations used as poll sites on election days . . .."). The County is obligated "once it occupies a facility . . . [to] provide access to all of the programs conducted in that space." RJN Ex. O (ADA Title II Technical Assistance Manual, § II-6.4000). But when a facility or part of a facility is "constructed by, on behalf of, or for the use of a public entity," the public entity has another ADA obligation to ensure that the facility is "readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. §§ 35.151; see also *id.* §§ 35.149-35.150. Pico Rivera Library is a facility designed and constructed after January 26, 1992, by, on behalf of, or for the use of the County. It has elements that do not comply with the ADA Standards. SUF No. 82. Under the ADA's program accessibility provisions, the County must comply with the ADA Standards so the Pico Rivera Library is "readily accessible to and usable by individuals with disabilities." *See* 28 C.F.R. § 35.151(a)(1). And when it does not, as here, it is a violation of the ADA.

Los Angeles County's vote centers are not accessible to people with disabilities and the County has failed to comply with the ADA to ensure that its in-person voting program is readily accessible to and usable by people with disabilities. Moreover, the County must prioritize a method of compliance with the program access requirements that offers programs to individuals with disabilities "in the most integrated setting appropriate." 28 C.F.R. § 35.150(b)(1). The County's designation and use of inaccessible vote centers denies individuals with disabilities the opportunity to vote in the most

integrated setting, with the same ease and convenience as non-disabled voters. *See Kerrigan v. Philadelphia Bd. of Election*, No. 07-687, 2008 WL 3562521, *17-19 (E.D. Penn. Aug. 14, 2008) (holding failure to ensure voters with mobility disabilities can vote at their neighborhood polling places violates the program access and integration mandates and denying summary judgment for defendants based on evidence they violated the site selection regulation); *see also* 28 C.F.R. § 35.130(d).

The County cannot dispute that it fails to provide an accessible program for voters with mobility and vision disabilities to vote in person. As the County fully controls site selection and use of temporary remedial measures, it bears complete responsibility for the pervasive accessibility barriers at its vote centers.

## IV.    CONCLUSION

The right to vote is fundamental to our democracy. Therefore, it is vital that the Court ensure that individuals with disabilities in Los Angeles County have an equal opportunity to vote in person, privately and independently. As the United States has shown, despite the ADA's clear mandate, the County's in-person voting program is inaccessible to individuals with disabilities.

For the foregoing reasons, the United States requests the Court grant its motion for partial summary judgment. A determination of liability will allow the parties to work together to improve vote center accessibility for the 2024 Presidential Election and later elections.

Dated: April 17, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Chief, Civil Division
RICHARD M. PARK
Chief, Civil Rights Section

KRISTEN CLARKE
Assistant Attorney General for Civil Rights
REBECCA B. BOND
Chief, Disability Rights Section
KEVIN KIJEWSKI
Deputy Chief, Disability Rights Section

_/s/ Katherine M. Hikida_
KATHERINE M. HIKIDA
MATTHEW J. BARRAGAN
MARGARET M. CHEN
ALEXANDRA YOUNG
Assistant United States Attorneys

_/s/ Alice W. Yao_
ELIZABETH JOHNSON
ALICE W. YAO
KATHERINE DUTCHER
Trial Attorneys
Disability Rights Section

Attorneys for Plaintiff
United States of America

19

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>

The undersigned, counsel of record for Plaintiff United States of America,

certifies that the memorandum of points and authorities contains 6,507 words, which

complies with the word limit set by the Court's Initial Standing Order, ECF No. 10 at 5.

Dated: April 17, 2024                                Respectfully submitted,

E. MARTIN ESTRADA                        KRISTEN CLARKE
United States Attorney                        Assistant Attorney General for Civil Rights
DAVID M. HARRIS                            REBECCA B. BOND
Chief, Civil Division                            Chief, Disability Rights Section
RICHARD M. PARK                            KEVIN KIJEWSKI
Chief, Civil Rights Section                    Deputy Chief, Disability Rights Section


   */s/ Katherine M. Hikida*                    */s/ Alice W. Yao*
KATHERINE M. HIKIDA                      ELIZABETH JOHNSON
MATTHEW J. BARRAGAN                    ALICE W. YAO
MARGARET M. CHEN                          KATHERINE DUTCHER
ALEXANDRA YOUNG                          Trial Attorneys
Assistant United States Attorneys            Disability Rights Section

                                                          Attorneys for Plaintiff
                                                          United States of America